IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DESIREE WILLIAMS,

          Plaintiff,

      v.                            Civil Action No. 1:09-CV-84

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

## **REPORT AND RECOMMENDATION**
## **SOCIAL SECURITY**

### **I. Introduction**

A.    <u>Background</u>

      Plaintiff, Desiree Williams (Claimant), filed a Complaint on June 22, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

24, 2009.[2]  Claimant filed his Motion for Summary Judgment on September 23, 2009.[3]

Commissioner filed his Motion for Summary Judgment on October 21, 2009.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 10.

[4] Docket No. 11.

2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision to discredit Claimant and to accord little weight to the opinion of Claimant's treating source.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

<u>Procedural History</u>

Claimant filed an application for Supplemental Security Income (SSI) on June 26, 2006, alleging disability due to tendonitis and bursitis in left arm and shoulder; inflammation in neck, shoulder and back; diabetes; high cholesterol; GERD; gout; and glaucoma with an onset date of June 1, 2006. (Tr. 100). The claim was denied initially on August 23, 2006, and upon reconsideration on April 13, 2007. (Tr. 70, 75). Claimant filed a written request for a hearing on June12, 2007. (Tr. 78). Claimant's request was granted and a hearing was held on July 15, 2008. (Tr. 33-67).

The ALJ issued an unfavorable decision on September 26, 2008. (Tr. 12-32). The ALJ determined Claimant was not disabled under the Act because she had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform

(20 CFR 404.1560(c) and 404.1566). (Tr. 18-30). On November 5, 2008, Claimant filed a request for review of that determination. (Tr. 5-7). The request for review was denied by the Appeals Council on April 25, 2009. (Tr. 1). Therefore, on April 25, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on January 29, 1958, and was forty-eight (48) years old as of the onset date of her alleged disability and fifty (50) as of the date of the ALJ's decision. (Tr. 37, 100). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations at the time of her onset date. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant was considered a "person closely approaching advanced age," age 50-54, at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(d). Claimant completed the seventh grade, received her GED in 1991, and received a nursing certificate. (Tr. 38-39). Claimant has previous work experience as a cashier at Convenient Food Mart and CNA for an in-home nursing agency. (Tr. 40-45).

C.      Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Psychiatric Review Technique, Frank Roman, Ed.D., 11/18/05 (Tr. 218-24)**
•       medical dispositions: impairment(s) not severe

- categories upon which medical disposition is based:
  - 12.03 schizophrenic, paranoid and other psychotic disorders
    - delusions or hallucinations
  - 12.04 affective disorders
- rating of functional limitations
  - restriction of daily activities: mild
  - difficulties in maintaining social functioning: mild
  - difficulties in maintaining concentration, persistence, or pace: mild
  - episodes of decompensation, each of extended duration: none
- notes:
  - mental status exam: adequately oriented; depressed with sad demeanor and flat affect; at times showed some mild confusion; no paranoid ideations; at times showed an indifferent attitude; no perceptual deficits; fair insight; severely impaired judgment; mildly deficient concentration
  - memory: moderately deficient immediate memory; severely impaired recent memory
  - Dx: Axis I 295.30 schizophrenia, paranoid type; 296.5 bipolar disorder, most recent episode depressed

**Physical Residual Functional Capacity Assessment, Cindy Osborne, DO, 8/8/06 (Tr. 298-305)**
- primary diagnosis: tendonitis left shoulder
- secondary diagnosis: vision impairment
- exertional limitations
  - occasionally lift: 50 pounds
  - frequently lift: 25 pounds
  - stand and/or walk (with normal breaks) for a total of: about 6 hours in 8-hour workday
  - sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
  - push and/or pull (including operation of hand and/or foot controls): unlimited
- postural limitations: none
- manipulative limitations: none
- visual limitations: none
- communicative limitations: none
- environmental limitations: none
- symptoms: complaints are out of proportion to expected and therefore partially credible; decrease RFC to medium

**Physical Residual Functional Capacity Assessment, Fulvio Franyutti, M.D., 4/3/07 (Tr. 422-29)**
- primary diagnosis: tendonitis of left shoulder
- secondary diagnosis: vision impairment
- external limitations:
  - occasionally lift: 50 pounds

- • frequently lift: 25 pounds
- • stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
- • sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
- • push and/or pull (including operation of hand and/or foot controls): unlimited
- • postural limitations: none
- • manipulative limitations: none
- • visual limitations: none
- • communicative limitations: none
- • environmental limitations: none
- • symptoms: claimant appears to be partially credible

**Vocational Analysis, Laurel Klein, 4/3/07 (Tr. 166)**

reviewed vocational analysis in file dated 8/16/07 and agrees with it

**Progress Notes, Goodwin Foot and Ankle Center, OVMC, 9/24/04-10/13/05 (Tr. 208-17)**
- • EMG Report 9/24/04
  - • results: nerve conduction velocities of peroneal and posterior tibial nerves bilaterally were unremarkable; amplitudes were normal. Distal motor latencies of peroneal and posterior tibial nerves bilaterally were unremarkable; amplitudes were normal. Distal sensory latencies for sural nerves bilaterally were normal; amplitudes were normal. F waves bilaterally of peroneal and posterior tibial nerves were normal. H reflexes for posterior tibial nerves bilaterally were normal.
  - • impression: abnormal nerve conduction velocities suggestive of neuropathy effecting both right and left lateral plantars. No radiculopathy detected.
- • 11/4/04
  - • exam: mild to moderate incurvation of medial and lateral margins of left hallux nail. Extreme pain with palpation of these areas. Large amount of subungual debris and callus in medial and lateral nail margins, increased on medial side. Mild erythema, mild soft tissue swelling, negative drainage and negative break in skin. Nails are thick and irregular discolored and mycotic.
  - • assessment: DM non-insulin dependent. Ingrown nail medial and lateral margins of left hallux nail; painful ambulation left foot. Paronychia of medial and lateral margins of left hallux nail with increase on medial side
- • 5/26/05
  - • exam: pain in left hallux; mild soft tissue swelling and mild erythema; negative drainage.
  - • assessment: diabetes mellitus non-insulin dependent; gout of the 1st IPJ left foot; painful ambulation
- • 6/9/05
  - • exam: left MPJ has improved; small possible ganglion of extensor tendon. Mild pain of the dorsal right hallux.

- • assessment: diabetes mellitus non-insulin dependent. Gout of 1st IPJ left foot. Onychomycosis bilateral. Painful ambulation
- • 7/14/05
  - • exam: left MPJ is improved
  - • assessment: diabetes mellitus non-insulin dependent. Gout of 1st IPJ left foot. Painful ambulation
- • 8/11/05
  - • exam: mild onycholysis
  - • assessment: diabetes mellitus non-insulin dependent. Onycholysis left hallux. Onychomycosis bilateral. Onychogryphosis bilateral. Painful ambulation.
- • 9/16/05
  - • plan: begin insulin therapy
- • 10/13/05
  - • exam: mild spicule formation in left hallux nail
  - • assessment: diabetes mellitus non-insulin dependent. Onychomycosis bilateral; onychogryphosis bilateral. Painful ambulation.

**Internal Medicine Examination, Kathleen Monderewicz, M.D., 9/5/05 (Tr. 192-97)**
- • chief complaint: neck and back pain
- • physical exam:
  - • neck: no evidence of thyromegaly, palpable masses or lymphadenopathy. Carotid arteries are normal and symmetrical bilaterally without bruits
  - • hands: no tenderness, redness, warmth, or swelling; no atrophy; claimant can make a fist; no Heberden or Bouchard nodes; grip strength measures 27 kg of force on right and 20 kg on left; able to write and pick up coins without difficulty; normal range of motion
  - • cervical spine: tenderness over muscle inserts of occiput and cervical spinous process at C7; no evidence of paravertebral muscle tenderness or spasm; flexion is normal; extension is slightly decreased; lateral flexion is normal; rotation is normal to right and limited to left
  - • dorsolumbar spine: normal curvature; no tenderness over thoracic or lumbar spinous processes or over facette joint lines; tenderness over medial areas of upper trapezius muscles; straight leg raise test in sitting and supine position is normal; forward flexion is normal; no hip joint tenderness, erythema, warmth, swelling, or crepitus; normal extension, abduction, and adduction of hips
- • impression: chronic neck and back pain
- • summary: neck tender around occiput and C7 with only slight decrease in extension and decrease in rotation to the left. Deep tendon reflexes and sensation were normal and symmetric; Tinel and Phalen testing negative; fine manipulation was intact. Only areas of tenderness in back were over trapezius muscles; straight leg test negative for radiculopathy; deep tendon reflexes and sensation were normal and symmetric; only evidence of possible nerve root impingement was weakness with left ankle plantar flexion. Only slight decrease with lateral flexion bilaterally.

**Emergency Room Records, Ohio Valley Medical Center, 7/16/05-2/10/06 (Tr. 225-43)**
- 12/5/05
  - chief complaint: gout
  - clinical impression: pain, left first toe, suspect gout
  - disposition: prescription for Indocin and Darvocet
- 12/29/05
  - chief complaint: left great toe distally
  - hospital course: do not feel this is gout. See podiatrist since she is diabetic. Given prescription for Tramadol
  - final diagnosis: left great toe pain; probably ingrown nail; diabetes, on insulin
- 2/10/06
  - chief complaint: chest pain
  - diagnosis: chest pain and MVA
  - disposition: AMA
  - condition: satisfactory

**Radiology and Lab Reports, Ohio Valley Medical Center 7/16/05-5/17/06 (Tr. 261-76)**
- 4/4/06 Mammography Unilateral Right
  - no pathological calcifications, skin thickening or spiculated masses
  - impression: stable moderate fibrocystic changes; Bi-rads 3 probably benign findings

**X-ray Report, Eli Rubenstein, M.D., 8/17/05 (Tr. 198)**
- lumbar spine
- impression: normal lumbar spine

**Emergency Department Records, Wheeling Hospital, 2/10/06 (Tr. 244-60)**
- chief complaint: back, neck, and chest pain
  - seem at OVMC for same complaint - discomfort started 2/9/06 at night. Unable to sleep due to pain in left shoulder and arm.
- impression: thoracic vertebrae are of normal height and alignment; some mild scoliosis present; no fracture or malalignment
- impression: cervical vertebrae are of normal height and alignment; well corticated bony density adjacent to anterior aspect of inferior endplate of C6, which appears to be a chronic osteophyte. No fracture or malalignment seen
- overall assessment: normal
- findings/change: heart size is normal; lungs are clear
- discharge instructions: continue current medications

**Medical Reports, Roland Chalifoux, Jr., DO, Valley Neurosurgery, 2/23/06-11/7/06 (Tr. 306-39)**
- 2/23/06

- physical exam:
  - neck: soft and supple with decreased range of motion, particularly with rotation. Multiple paracervical spasm
- musculoskeletal:
  - cervical: left and right rotation 60 degrees bilaterally; lateral bending 40 degrees bilaterally; flexion 60 degrees; extension 50 degrees
  - shoulder: normal range of motion in both left and right arms
  - thoracic: rotation 20 degrees bilaterally; kyphosis 20 degrees
  - lumbar: intact; left and right lateral flexion 20 degrees; flexion 40 degrees; extension 20 degrees
- impression: progressive neck discomfort due to cervical sprain/strain with need for further evaluation and treatment
- recommendations: medication; trigger point injections; occipital blocks
- 3/2/06
  - impression: progressive occipital pain with occipital cephalgia and trigger point pain with need for further evaluation
  - recommendations: trigger point injections; occipital blocks bilaterally
- 3/8/06
  - impression: progressive occipital pain with occipital cephalgia and trigger point pain bilaterally, left worse than right
  - recommendations: continue current medications; continue chiropractic treatments
- 3/15/06 Procedure Report
  - preoperative and postoperative diagnosis: flexion injury to cervical region with secondary multiple trigger points in and around cervicothoracic junction
  - procedure: trigger point injections x6, 2 to 3 muscles in and around trapezial regions bilaterally involving the levator scapulae, trapezius, and rhomboid major.

- 4/5/06
  - preoperative and postoperative diagnosis: secondary injury to cervical spine with cervical sprain/strain as well as pain to left upper shoulder region
  - procedures: trigger point injection x3 involving 2 to 3 muscles in cervical spine, trapexius, levator scapulae, and rhomboid muscles; injection of shoulder bursa in and around suprascapular muscle
- 5/3/06
  - neck: carotids are intact; trigger point pain in suprascapular and trapezial area
  - impressions: secondary pain to cervical, lumbar, and shoulder with cervical and shoulder giving her most problems; progressive neck discomfort with decreased range of motion; trigger points in suprascapular and trapezial area
- 7/14/06
  - impressions: secondary pain to cervical and shoulder areas; progressive neck pain; decreased range of motion secondary to herniated disk at C4-C5, C5-C6 per MRI; left shoulder pain secondary to tendinitis; multiple trigger points in left area
  - procedure: insert ESI cervical spine
  - preoperative/postoperative diagnosis: left arm pain secondary to supraspinatus

- tendinitis
- 8/3/06
  - preoperative/ postoperative diagnosis: progressive neck pain secondary to herniated disk at C4-C5, C5-C6
  - procedures: use of C-arm for identification of proper location for epidural injection; interlaminar epidural steroid injection at C4-C5
- 8/9/06
  - assessment: status post MVA with secondary pain in cervical and shoulder area on the left; decreased range of motion secondary to centralized disk at C4-C5, C5-C6
  - recommendations: needs physical therapy, has no followed up with this; trigger point of cervical area
  - procedure: injection of Kenalog to multiple triggers involving 2-3 muscles in Cervical spine
- 8/23/06
  - impressions: status post MVA with secondary pain in cervical and shoulder area; decreased range of motion secondary to centralized disk at C4-C5, C5-C6 which has been only marginally responsive to ESIs
  - recommendations: facet injections; multiple trigger point and spasm due to postural issues in cervical spine and shoulder area; supraspinatus tendinitis in left shoulder
- 10/16/06
  - impression: status post MVA with secondary pain in cervical and shoulder area on left; decreased range of motion secondary to centralized disk at C4-C5, C5-C6 as well as continued neck pain with range of motion
  - marginal improvement with ESIs with recommendation for mechanical treatment since she has no focal or lateralizing issues
  - recommendations: facet injections needed without corticosteroids; orthopedic evaluation for left arm shoulder area
- 10/31/06
  - preoperative/postoperative diagnosis: status post motor vehicle accident with secondary neck pain, secondary to facet pain and dysfunction
  - procedure: left sided facet injections of C4-C5, C5-C6, C6-C7 using C-arm fluroscopic guidance; injection fo Kenalog
- 11/7/06
  - impression: status post MVA with secondary pain in cervical and shoulder area on left; decreased range of motion secondary to combination of centralized disk at C4-C5, C5-C6 as well as facet discomfort
- MRI Report 5/25/06
  - findings: straightening of cervical lordotic cervature; cervical vertebrae and cervical spinal cord are normal
  - impression: disc herniation centrally at C4-5 and C5-6
- MRI Report 5/25/06
  - findings: supraspinatus tendon is intact with mild tendinopathy; remaining

tendons of rotator cuff are normal in signal and morphology
- impression: supraspinatus tendinopathy

**Progress Notes, William Grubbs, D.C., 3/22/06-1/3/07 (Tr. 345-73)**
- 3/22/06
  - primary symptoms: neck pain; left arm pain, numbness, and tingling; upper back pain that comes and goes
  - recommend continued therapy to consist of moist heat, EMS, US, MM, and manipulation
- 3/24/06
  - subjective: therapy was of some benefit; felt a little looser
  - objective:  posterior cervical muscles were taut; tender at base of occiput; trigger points in upper trap
- 3/27/06
  - subjective: improving; heat helps
  - objective: tautness and tenderness in posterior cervical area; latent trigger points in upper trap and levator scapulaa
- 3/29/06
  - subjective: doing better, little less neck and back pain
  - objective: base of occiput is tender; latent trigger points in upper trap, levator scapula bilaterally
- 3/31/06
  - subjective: improving but still sore in neck and upper back
  - objective: posterior cervical muscles are taut; base of occiput is tender; latent trigger points in levator scapula and upper trap bilaterally
- 4/3/06
  - significant neck and upper back pain; quit job on the 24th.  Posterior cervical muscles are taut; latent trigger points in upper trap and levator scapula bilaterally
- 4/7/06
  - posterior cervical muscles are taut; latent trigger in upper trapezius and levator scapula
- 4/10/06
  - neck and upper back pain, but doing better overall.  Posterior cervical muscles are taut; latent trigger points in upper trap and levator scapula bilaterally
- 4/12/06
  - feeling better not as much neck and upper back pain.  Less tautness and tenderness
- 4/19/06
  - more neck and upper back pain; notices difference without treatment.  Posterior cervical muscles and base of occiput are very taut.  Trigger points in upper trapezius bilaterally
- 4/21/06
  - improving; not as much neck pain.  Posterior cervical muscles are taut; no active trigger points

- <u>4/24/06</u>
  - feels stiffer; active trigger points in upper traps and levator scapula
- <u>4/26/06</u>
  - neck and upper back pain; is improving. No active trigger points just tenderness
- <u>4/28/06</u>
  - improving. Latent trigger points in upper trap. Nothing active; base of occiput is tender
- <u>5/8/06</u>
  - neck and upper back pain; posterior cervical muscles are taut. Base of occiput is tender. Active trigger points in upper trap and levator scapula bilaterally.
- <u>5/10/06</u>
  - overall feeling better; less tenderness and tautness; latent trigger points in upper trapezius and levator scapula
- <u>5/26/05</u>
  - more neck and upper back pain. Posterior cervical muscles are taut; base of occiput is tender; active trigger points in upper trapezius and levator scapula bilaterally.
- <u>6/2/06</u>
  - doing better; not as much pain; spasm in lower thoracic area on left with latent trigger points in upper trapezius
- <u>6/7/06</u>
  - feeling better; posterior cervical muscles remain taut; latent trigger points in upper trap
- <u>6/9/06</u>
  - doing better; doesn't have as much tautness or tenderness
- <u>6/12/06</u>
  - not as much tautness or tenderness; tenderness at base of occiput; latent trigger points in upper trap
- <u>6/19/06</u>
  - neck feels tight and tense; base of occiput is tender; latent trigger points in upper trap
- <u>6/21/06</u>
  - doing better; less neck pain and stiffness; palpates better
- <u>6/23/06</u>
  - showing improvement; trigger points in upper traps bilaterally
- <u>7/5/06</u>
  - active trigger points in upper trapezius bilaterally; cervical range of motion restricted; shoulder depressor test positive on left
- <u>8/23/06</u>
  - cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally; cervical spine mobilized in prone position with good movement
- <u>8/25/06</u>
  - showing improvement; posterior cervical muscles not as taut and tender. Latent

trigger points in upper trapezius bilaterally

- 8/30/06
  - showing improvement; latent trigger points in upper trapezius bilaterally; palpation revealed posterior cervical muscles taut and tender
- 9/6/06
  - cervical range of motion restricted; shoulder depressor test positive bilaterally; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in upper trapezius bilaterally
- 9/11/06
  - cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in upper trapezius
- 9/13/06
  - condition showing improvement; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius
- 9/15/06
  - pain and stiffness in neck and upper back; palpation revealed posterior cervical muscles taut and tender; no active or latent TP's
- 9/20/06
  - neck and upper back pain; cervical range of motion was restricted; palpation revealed posterior cervical muscles were taut and tender; trigger points were found in upper trapezius bilaterally
- 9/22/06
  - showing improvement; best felt in some time; palpation revealed posterior cervical muscles were taut and tender. Shoulder depressor test positive on left
- 9/25/06
  - best weekend had in months; palpation revealed posterior cervical muscles taut and tender; no TP's
- 9/27/06
  - continued improvement; cervical range of motion restricted; palpation revealed posterior cervical muscles were taut and tender
- 10/2/06
  - neck and upper back pain; pain getting less with regular tx; palpation revealed posterior cervical muscles were taut and tender; latent trigger points found in upper trapezius bilaterally
- 10/4/06
  - showing improvement; less pain; palpation revealed posterior cervical muscles taut and tender; cervical distraction test negative; foramina compression test negative; shoulder depressor test positive on left; no TP's
- 10/9/06
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally
- 10/13/06
  - showing improvement; cervical range of motion restricted; palpation revealed

posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius

- <u>10/16/06</u>
  - neck and upper back pain;palpation revealed posterior cervical muscles taut and tender; latent trigger points found in upper trapezius bilaterally
- <u>10/20/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally and left levator scapula; C3 to T-4 spinouses are tender
- <u>10/27/06</u>
  - neck and upper back pain; palpation revealed posterior cervical muscles taut and tender; shoulder depressor test positive on left; trigger points found in upper trapezius bilaterally, left levator scapula, and left rhomboid major
- <u>11/3/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally, left levator scapula, and left rhomboid major; shoulder depressor test positive on left
- <u>11/8/06</u>
  - showing improvement; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius
- <u>11/10/06</u>
  - feeling better; less neck pain and stiffness; palpation revealed posterior cervical muscles were not as taut and tender; trigger points found in upper trapezius; shoulder depressor test was negative
- <u>11/13/06</u>
  - feeling better; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius
- <u>11/17/06</u>
  - improving; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius
- <u>11/22/06</u>
  - neck and upper back pain and headaches; tautness and tenderness of posterior cervical area with an active trigger point in left upper trapezius and left levator scapula
- <u>11/29/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left leator scapula; shoulder depressor test was postiive on left
- <u>12/4/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed

posterior cervical muscles taut and tender; trigger points found in left upper trapezius bilaterally and left levator scapula. Shoulder depressor test positive bilaterally

- <u>12/6/06</u>
  - showing improvement; less tenderness and better motion; cervical range of motion full with pain at extremes; cervical distraction test was negative; shoulder depressor test positive on left
- <u>12/11/06</u>
  - feels better; not as much pain or stiffness; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; shoulder depressor test positive on left
- <u>12/13/06</u>
  - showing improvement; less tenderness and better mobility; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius
- <u>12/20/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius; shoulder depressor test positive bilaterally
- <u>12/22/06</u>
  - showing improvement; palpation revealed posterior cervical muscles taut and tender; no trigger points found
- <u>12/27/06</u>
  - neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius; shoulder depressor test positive on left
- <u>12/29/06</u>
  - showing improvement; ROM better; less tautness and tenderness
- <u>1/3/07</u>
  - neck and upper back pain; pain worse on left; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius and left scapula; shoulder depressor test positive on left

**Physical Therapy Treatment Notes, OVMC, 6/22/06-6/29/06 (Tr. 283-89)**
- <u>6/22/06</u>
  - referred for s/p MVA left shoulder pain, left biceps tendonitis, and neck pain.
  - problem list: decreased ROM, pain, decreased strength
  - goals: ROM WNL's; pain less than or equal to 2/10; 4+/5 Rue strength
  - prognosis: fair prognosis for improved functional abilities provided she is compliant with treatment.
- <u>6/26/06</u>
  - subjective: decreased pain since last Rx
  - objective: aquatics; Rx completed with Ionto/Ice to left LH biceps tendon and MH/IFES to bilateral C-psm's and UT

- • assessment: Pt tol TX well
- • 6/27/06
  - • subjective: no new complaints
  - • objective: continue with MH/IFES to bilateral C-psm's and Ionto/Ice to left LH biceps tendon
  - • assessment: Pt tol Rx well

**Emergency Treatment Records, Wheeling Hospital, 7/5/06 (Tr. 290-97)**
- • chief complaint: left great toe
- • diagnosis: contusion left great toe

**Medical Records, Marilyn Horacek, D.O., 8/21/06-1/3/07 (Tr. 374-84)**
- • 8/21/06
  - • chief complaint: numbness on right side; illegible
  - • exam: head/neck - illegible; mood/affect: angry and fearful at times
  - • assessment/plan: chronic severe neck pain; illegible
- • 10/2/06
  - • chief complaint: neck pain
  - • assessment/plan: illegible; chronic neck pain
- • 1/3/07
  - • no specific complaints today
  - • neck exam: supple without organomegaly, mass or lymphadenopathy
  - • musculoskeletal: spine without tenderness, curvature or back spasm
  - • neurologic: patient is A&O and in no acute distress; answers questions appropriately
  - • assessment: diabetes mellitus; early abscess to right hand; rhinitis
  - • plan: given Keflex

**Treatment Records, Mark Rodosky, M.D., UPMC Center for Sports Medicine, 11/20/06 (Tr. 341-43)**
- • chief complaint: left shoulder pain
- • assessment: impingement left shoulder
- • plan: left shoulder arthroscopy with arthroscopic subacromial decompression with possible repair

**Medical Records, Marilyn Horacek, D.O., 1/16/07-7/7/08 (Tr. 540-615)**
- • 1/16/07 stress test report
  - • conclusions: non-diagnostic EKG portion of the stress test because of pre-existing changes; no chest pain; mildly hypertensive blood pressure response with mild hypertension at baseline; no complex ventricular ectopy
- • 1/16/07 myocardial perfusion imaging report
  - • conclusions: normal myocardial perfusion study with no evidence of ischemia or prior infarction; normal left ventricular volumes, wall motion and wall thickening and ejection fraction; LV volume curve consistent with normal systolic and

- diastolic function
- <u>3/10/07 radiology report</u>
  - chest impression: no acute or active process
  - cervical spine impression: negative cervical spine
  - left shoulder impression: negative left shoulder
  - dorsal spine impression: no definite evidence of an acute fracture
- <u>3/30/07 radiology report</u>
  - chest impression: no acute pulmonary process; normal heart size
- <u>5/16/07 MRI of cervical spine</u>
  - impression: small posterior central disc herniations at C4/C5 and C5/C6 without interval change since study of 5/25/06
- <u>7/9/07 EMG report</u>
  - clinical impression: could have bilateral carpal tunnel syndrom vs. diabetic polyneuropathy effecting both median and ulnar nerves in upper extremities. Chronic process most likely in C5 nerve root distribution
- <u>8/30/07 Operative Report</u>
  - preoperative and postoperative diagnosis: left shoulder chronic full-thickness rotator cuff tear; left shoulder subacromial impingement; left shoulder frozen shoulder
- <u>3/25/08 radiology report</u>
  - impression: significant decrease in size of joint space and edema within the rotator cuff ; small partial tear involving the articular surface of supraspinatus; labrum is intact
- <u>5/2/08 radiology consultation</u>
  - impression: no evidence of nephrolithiasis or hydronephrosis; multiple pelvic calcifications; no other abnormalities
- <u>1/22/07</u>
  - assessment/plan: left rotator cuff injury; diabetes mellitus; hypertension; chronic pain
- <u>3/12/07</u>
  - extremities: left shoulder - no deformity appreciated
  - neck: some posterior cervical spasm
  - assessment: chronic left shoulder and left neck pain; diabetes mellitus
- <u>3/28/07</u>
  - extremities: no edema
- <u>5/14/07</u>
  - chief complaint: left shoulder pain; illegible
  - exam: left shoulder - no deformity appreciated
  - assessment: left shoulder pain; prescribed vicodin; MRI; illegible
- <u>8/6/07</u>
  - chief complaint: elevated blood sugar
  - assessment: left shoulder pain; rotator cuff; completed pre-op at UPMC; illegible
- <u>11/5/07</u>
  - chief complaint: illegible

- • assessment: left shoulder pain; illegible
- 1/4/08
  - • chief complaint: spasms in shoulders and arms
  - • assessment: left shoulder pain - refill Vicodin
- 3/10/08
  - • chief complaint: still having shoulder pain
  - • assessment: DM Type II, chronic left shoulder pain - vicodin
- 4/7/08
  - • chief complaint: still having shoulder pain; constant pain
  - • assessment: left shoulder adhesive illegible; depression - stable; DM Type II insulin dependent
- 4/29/08
  - • chief complaint: left shoulder pain
  - • assessment: left shoulder adhesive capsulitis; small supraspinatus tear; possible infection left shoulder area; DM Type II
- 5/13/08
  - • chief complaint: left shoulder pain feels better
  - • assessment: left shoulder adhesive capsulitis; small supraspinatus tear; DM Type II; illegible
- 6/19/08
  - • chief complaint: clearance for surgery; rotator cuff repair
  - • assessment: left shoulder adhesive capsulitis; left shoulder supraspinatus tear; DM; illegible
- 7/7/08
  - • assessment: left shoulder pain illegible; DM type II illegible; illegible

**Progress Notes, William Grubbs, D.C., 1/24/07-8/29/07 (Tr. 515-24)**
- 1/24/07: neck, upper back, left shoulder pain and stiffness; cervical range of motion and shoulder motion restricted; trigger points in left upper trapezius, left levator scapula, and left rhomboid major; shoulder depressor test positive bilaterally
- 1/29/07: neck and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula; shoulder depressor test positive on the left
- 1/31/07: patient reported feeling better; palpation revealed posterior cervical muscles taut and tender; latent trigger poitns found in left upper trapezius and left levator scapula; shoulder depressor test positive on left
- 2/23/07: better movement in left shoulder; neck and upper back pain; cervical range of motion restricted; shoulder motion full with pain on left; weakness on left bicep, triceps and deltoid; tinel's sign negative; Cozen's test negative; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally; foramina compression test positive; cervical distraction test negative
- 2/26/07: feeling better; cervical range of motion restricted; shoulder depressor test positive on left; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius

- <u>3/9/07</u>: showing improvement; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius and left levator scapula
- <u>3/14/07</u>: foramina compression test positive for increased neck pain; shoulder depressor test positive bilaterally; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally, left levator scapula, and left rhomboid major; left shoulder motion restricted; left drop arm test negative; left deltoid quite tender; lumbar range of motion full and uneventful; gait normal
- <u>3/21/07</u>: limited movement in left shoulder; restricted cervical range of motion; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius and left levator scapula
- <u>3/23/07</u>: little improvement; not quite as tender; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in upper trapezius bilaterally and left levator scapula
- <u>3/26/07</u>: showing improvement; less pain and tightness
- <u>4/2/07</u>: neck, upper back, and left shoulder pain; cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>4/4/07</u>: showing improvement; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left levator scapula
- <u>4/11/07</u>: neck, left shoulder and upper back pain; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula; left shoulder ROM is restricted
- <u>4/18/07</u>: showing improvement; palpation revealed posterior cervical muscles taut and tender; latent trigger points found in left upper trapezius and left levator scapula
- <u>4/25/07</u>: cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>4/30/07</u>:  cervical range of motion and shoulder motion restricted; trigger points found in left upper trapezius and left levator scapula
- <u>5/4/07</u>: showing improvement; cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius
- <u>5/9/07</u>: condition regressed; cervical bilateral shoulder range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula; shoulder depressor test positive on left; foramina compression test positive for increased neck pain
- <u>5/14/07</u>: tenderness in upper trapezius area
- <u>5/21/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>5/25/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius;

shoulder depressor test positive on left

- <u>5/30/07</u>:  palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>6/1/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>6/4/07</u>: cervical and shoulder ROM restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>6/13/07</u>:  cervical range of motion and shoulder motion restricted; trigger points found in left upper trapezius and left levator scapula
- <u>6/18/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius
- <u>6/22/07</u>:  palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>6/25/07</u>:  cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>6/29/07</u>: condition regressed; cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>7/6/07</u>:  palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>7/9/07</u>: not doing well; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>7/13/07</u>: showing some improvement; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius
- <u>7/18/07</u>:  cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>7/20/07</u>: latent trigger points in left upper trapezius and levator scapula; posterior cervical muscles are taut and tender
- <u>7/25/07</u>:  cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>7/30/07</u>: condition regressed; cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius
- <u>8/1/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius
- <u>8/3/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>8/8/07</u>: not as much pain or tautness or tenderness

- <u>8/13/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula; shoulder depressor test positive on left; foramina compression test positive for increased neck pain; cervical distraction test negative
- <u>8/17/07</u>:  cervical range of motion and shoulder motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula; shoulder depressor test positive on left
- <u>8/20/07</u>:  cervical range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>8/24/07</u>: cervical and shoulder range of motion restricted; palpation revealed posterior cervical muscles taut and tender; trigger points found in left upper trapezius and left levator scapula
- <u>8/29/07</u>: palpation was a little looser; not as taut or tender

**<u>Outpatient Medical Records, Wheeling Hospital 2/6/07-2/9/07 (Tr. 385-93)</u>**
- <u>2/6/07</u>
  - diagnosis: L shoulder manipulation and injection/ DOS 2/9/07
- <u>2/6/07</u>
  - procedure: left shoulder manipulation and injection
- <u>2/9/07 Outpatient Surgery/Procedure</u>
  - pre-op diagnosis: frozen left shoulder
  - proposed surgery/procedure: man/ illegible left frozen shoulder
- <u>2/9/07 Operative Report</u>
  - preoperative and postoperative diagnosis: adhesive capsulitis left shoulder
  - operation: manipulation, lysis of adhesions and injections left frozen shoulder

**<u>Office Notes, Zaleski Orthopedics, Inc., Wheeling Hospital, 2/9/07-3/20/07 (Tr. 421)</u>**
- <u>2/20/07</u>
  - internal/external rotation views of left shoulder reveal no bony disruption or other displacement.  Normal glenohumeral relationship.  Motion is markedly improved.
- <u>3/20/07</u>
  - motion is fairly well maintained subsequent to a manipulation; some limitation in internal rotation; reproducible tenderness in subacromial space; x-ray internal external rotation views reveal glenohumeral joint to be well preserved; no evidence of fracture; no significant tenderness over AC joint.  Presumptive working diagnosis of left subacromial bursitis

**<u>Emergency Department Records, Wheeling Hospital, 2/10/07 (Tr. 394-408)</u>**
- reason for visit: elevated blood sugar
- diagnosis: hyperglycemia

- medications & treatments: regular insulin
- discharge instructions: watch sugars; continue with usual amount of insulin
- impression: no acute infiltrates or change except for possible increase in heart size

**Emergency Department Records, Wheeling Hospital, 2/27/07 (Tr. 409-15)**
- reason for visit: muscle spasm in neck
- diagnosis: neck spasms
- discharge instructions: flexeril; hydrocodone bitartrate and acetaminophen

**Emergency Department Records, OVMC, 3/10/07 (Tr. 417-19)**
- chief complaint: motor vehicle accident
- assessment: multiple contusions, cervical strain, left shoulder contusion, status post motor vehicle collusion
- disposition: discharged home, given a prescription for Motrin, contusion instructions. Return for worsening symptoms or concerns
- condition at discharge: good

**Office treatment Records, Roland Chalifouz, DO, 3/19/07-5/2/07 (Tr. 530-38)**
- 3/19/07
  - neck exam: soft with paracervical spasm on left primarily; able to shrug shoulder but with complaints of pain primarily in supraspinatus area
  - neurologic: motor strength is 5/5; no drift; palpation of left shoulder reveals pain in suprascapular region and infrascapular region; biceps pain; decreased strength on left primarily secondary to pain
  - impressions: acute rotational injury to left shoulder area; history of diabetes mellitus and need for good control; history of left shoulder pain with need for reevaluation
  - recommendations: MRI
- 4/9/07
  - impression: secondary rotational injury to left shoulder area; history of diabetes with need for good control and significant sensitization to corticosteroids; history of left shoulder pain with need for followup MRI study
  - recommendations: continue with Vicodin and chiropractic manipulative treatment
- 5/2/07
  - discharged from service; indicates patient doing well
  - recommendations: one month's supply of medication; followup with primary physician

**Office Treatment Records, Mary Haus, M.D., 5/21/07-7/2/07 (Tr. 525-28)**
- 5/21/07
  - assessment: shoulder impingement; R/O adhesive capsulitis; R/O cuff tear
  - plan: follow up after MRI
- 6/20/07
  - assessment: rotator cuff tear

- • plan: check EMG
- 7/2/07
  - • assessment: rotator cuff tear
  - • plan: EMG; injection

**Radiology Report, Mary Haus, OVMC, 6/6/07 (Tr. 430-31)**
- • MRI left shoulder
- • impression: full thickness supraspinatus tendon tear near attachment with no tendon retraction; edema within anterior rotator cuff interval as well as a small amount of fluid in subacromial-subdeltoid space.  Lateral downsloping of acromion process; intact biceps-labral anchor complex; normal marrow signal

**Medical Records, Mark Rodosky, M.D., 6/6/07-10/22/08 (Tr. 625-56)**
- 6/6/07 MRI left shoulder
  - • impression: full thickness supraspinatus tendon tear near attachment with no tendon retraction; edema within anterior rotator cuff interval; small amount of fluid in subacromial-subdeltoid space; lateral downsloping of acromion process
- 7/23/07
  - • chief complaint: left shoulder pain
  - • assessment: left shoulder subacromial impingement, full-thickness rotator cuff tear, and adhesive capsulitis
  - • plan: recommend left shoulder arthroscopy with arthroscopic subacromial decompression, arthroscopic rotator cuff repair, capsular release, manipulation, and possible other repair
- 8/30/07 operative record
  - • preoperative and postoperative diagnosis: left shoulder chronic full-thickness rotator cuff tear; left shoulder subacromial impingement; left shoulder frozen shoulder
- 9/7/07 post op
  - • objective: left shoulder is supple and neurovascularly intact
  - • assessment: doing well; begin passive range of motion
- 11/12/07 follow up
  - • objective: external rotation is to neutral, forward flexion is to 80 degrees, internal rotation is to just past greater trochanter of hip; no bruising or ecchymosis; no significant tenderness; pain with range of motion
  - • assessment: physical therapy
- 1/14/08 office note
  - • chief complaint: doing well in terms of pain, but is still stiff
  - • approximately 100 degrees of elevation and 20 degrees of external rotation
- 3/17/08 office note
  - • objective: still stiff
  - • assessment: MRI arthrogram to look at rotator cuff
- 6/16/08 diagnostic report text
  - • MRI upper extremity arthrogram

- impression: significant decrease in size of joint space and edema within rotator cuff interval are findings suggestive of adhesive capsulitis; small partial tear involving articular surface of supraspinatus; bursal surface of rotator cuff is intact; supraspinatus is decreased in muscle bulk; labrum is intact
- 6/16/08 office note
    - objective: recurrent rotator cuff tear; full thickness or at least 50%
    - assessment: recommend right shoulder revision arthroscopic rotator cuff repair, capsular release, manipulation, possible repair of other tissue
- 10/14/08 operative report
    - preoperative diagnoses: recurrent chronic full-thickness rotator cuff tear, left shoulder; recurrent subacromial impingement, left shoulder; recurrent frozen shoulder left shoulder; left shoulder type I slap lesion
- 10/22/08 office note
    - objective: wounds are healing without sign of infection
    - assessment: back to therapy

**Office Notes, Zaleski Orthopedics, Inc., Wheeling Hospital, 6/21/07 (Tr. 617)**

- continued pain, weakness, dysfunction, and disruption in night sleep
- full thickness rotator cuff tear exists as well as a downward sloping acromium that probably predisposes to such pathology
- recommendation: repair left rotator cuff

**Medical Evidence of Record, Northwood Health Systems 7/25/07-5/21/08 (Tr. 472-513)**
- 7/25/07
    - presenting problems: stress; suspicious; appears angry; crying
    - presenting problem codes: 17 mental illness; 25 relationship problems; 21 physical health problems
    - current mental status: oriented x4; speech within normal limits; disheveled appearance; thought content within normal limits; withdrawn; memory mildly impaired
    - diagnostic impressions:
        - primary axis I: major depression, recurrent, with psychosis
        - secondary axis I: cocaine dependence
        - axis IV: social environment
    - treatment domains: psychiatric symptoms; psychological distress; physical health
- 7/26/07
    - problems: anxiety, medical problems
    - assessment:
        - appearance: unremarkable
        - grooming: unremarkable
        - speech: normal
        - suicidal ideation: denied
        - violent ideation: denied

- mood: normal
        - affect: unknown
  - outcome: attend therapy
- 8/13/07
  - mental status: grooming and attire is organized and casual; defensive and withdrawn; speech is normal; eye contact is fleeting; alert x4 with some indications of cognitive slowing at times; no suicidal or homicidal thoughts; no evidence of any psychotic thinking
  - assessment:
    - axis I: major depressive disorder, severe, recurrent with psychosis; cocaine abuse in remission; consider alcohol abuse
    - axis III: left shoulder pain, diabetes, hypertension, hypercholesterolemia
    - axis IV: difficulties with medical concerns
    - plan: antidepressants
- 9/18/07
  - problems: depressed mood
  - assessment:
    - appearance: unremarkable
    - grooming: unremarkable
    - speech: slow
    - suicidal ideation: denied
    - violent ideation: denied
    - mood: depressed
    - affect: normal
  - outcomes: therapeutic interventions
- 10/1/07
  - assessment: depressive disorder with exacerbating symptoms
  - plan: start Zoloft
- 10/30/07
  - problem: anxiety
  - assessment:
    - appearance: unremarkable
    - grooming: unremarkable
    - speech: normal
    - suicidal ideation: denied
    - violent ideation: denied
    - mood: anxious
    - affect: normal
  - outcome: coping strategies
- 11/1/07
  - assessment: symptoms improving with medication
  - plan: continue current medications
- 12/11/07
  - assessment: symptomatic with depression and insomnia

- plan: increase Zoloft and Restoril
- assessment:
  - appearance: unremarkable
  - grooming: unremarkable
  - speech: normal
  - suicidal ideation: denied
  - violent ideation: denied
  - mood: depressed
  - affect: normal
- 1/16/08
  - content: depressed; anxious; irritable; not sleeping
  - objective: cooperative; appearance is unremarkable; motor activity is slowed; speech soft; affect is blunted; oriented to person, place, and time
  - assessment: non-compliant with medication; depression
- 1/30/08
  - content: no difficulties today; no reported problems with sleep or appetite; denies irritability or agitation; normal mood; client notices improvement in mood, irritability and agitation
  - objective: cooperative; unremarkable appearance; activity level is normal; speech is normal; appears in good spirits; oriented to person, place and time
  - assessment: making progress
  - plan: no change; continue current medications
- 2/27/08
  - content: no difficulties; no reported problems with sleep or appetite; energy level normal; normal mood; no problems with medications
  - objective: cooperative; appears well groomed; activity level is normal; speech is normal; normal affect; oriented to person, place and time
  - assessment: no acute symptoms today
  - plan: continue current medications
- 3/26/08
  - content: physical problems; feeling depressed because of health and inability to work; trouble sleeping
  - objective: cooperative; appears well groomed; activity level is normal; speech is normal; affect is blunted; oriented to person, place and time
  - assessment: having situational difficulties
  - plan: continue medications; increase Restoril
- 4/8/08
  - problem: relationship problem
  - assessment:
    - appearance: unremarkable
    - grooming: unremarkable
    - speech: rapid
    - suicidal ideation: denied
    - violent ideation: denied

- mood: depressed
- affect: irritable
- outcome: therapeutic intervention - conflict resolution
- 4/22/08
  - problems: anxiety
  - assessment:
    - appearance: unremarkable
    - grooming: unremarkable
    - speech: rapid
    - suicidal ideation: denied
    - violent ideation: denied
    - mood: angry
    - affect: irritable
  - outcome: strategic therapeutic intervention: conflict resolution; therapeutic assignments: continue and follow through NHS services and treatment
- 4/23/08
  - content: no difficulties; sleeping well; energy level is normal; mood is normal; denies problems with medications
  - objective: cooperative; unremarkable appearance; normal activity level; normal speech; normal affect; oriented to person, place and time; no psychosis
  - assessment: making progress
  - plan: continue current medications
- 4/29/08
  - diagnosis:
    - primary axis I: major depression, recurrent, with psychosis
    - primary axis IV: social environment
    - secondary axis I: cocaine dependence
    - secondary axis V: current GAP
  - assessments needed: periodic evaluation
  - discharge plan/level of care change: reduction in symptoms to a level that doesn't interfere with daily functioning
  - summary/recommendations: history of substance abuse but denies any use or urges to use; recommend individual therapy to assist with development and utilization of coping mechanisms
- 5/21/08
  - content: no difficulties; sleeping well; energy level is normal; normal mood; no problems with medications
  - objective: cooperative; unremarkable appearance; normal activity level; normal speech; normal affect; oriented to person, place and time; no psychosis
  - assessment: situational difficulties
  - plan: no change; return in 4 weeks

**Physical Therapy Progress Notes, Jill Prezzia, PT, Mason Rehab 12/3/07-3/19/08 (Tr. 436-71)**

- <u>12/3/07</u>: patient is stiff today; continue with IFES to shoulder, therapeutic exercises for ROM
- <u>12/10/07</u>: continue with IFES to shoulder and PROM in all planes of her shoulder
- <u>12/14/07</u>: continue with IFES and therapeutic strengthening per her flow sheet
- <u>12/19/07</u>: continue with IFES to shoulder, PROM in all directions and therapeutic strengthening
- <u>12/24/07</u>: continue with IFES and therapeutic exercises for strengthening
- <u>1/4/08</u>: continue with PROM for shoulder, all directions. Continue with strengthening and IFES to shoulder
- <u>1/7/08</u>: continue with PROM for shoulder. Patient notes some increase in discomfort. Continue with IFES and therapeutic strengthening.
- <u>1/9/08</u>: cliking in shoulder today. Completes therapeutic exercises and IFES to shoulder.
- <u>1/11/08</u>: continue with PROM of shoulder in all directions and therapeutic strengthening along with IFES, patient is to see her physician in next several days.
- <u>1/18/08</u>: patient is without new complaints today. Continued with IFES to left shoulder. Continued with PROM in supine in all directions for shoulder. Continued with strengthening to increase motion and active use of left shoulder along with increasing strength
- <u>1/23/08</u>: continue with PROM of shoulder, IFES and therapeutic exercises in gym
- <u>1/28/08</u>: patient doing fairly well. Continue with PROM for all directions of shoulder, IFES and therapeutic strengthening
- <u>1/30/08</u>: continue with PROM for shoulder in all directions. Still very tight, wants to get up to approximately 120 degrees of flexion and approximately 110 degrees of abduction. ER has increased; still very tight along with her IR. Continue with strengthening and IFES to shoulder
- <u>2/4/08</u>: patient states she's doing fairly well. Continue with PROM in all directions of shoulder, continue with IFES and therapeutic strengthening
- <u>2/15/08</u>: completed PROM today for all ranges of shoulder; continue IFES and therapeutic strengthening
- <u>2/18/08</u>: continue with IFES to shoulder, PROM for all directions of shoulder and therapeutic strengthening
- <u>2/20/08</u>: continue with IFES to shoulder, PROM and strengthening for left shoulder
- <u>2/25/08</u>: continue with IFES to left shoulder along with PROM in all planes
- <u>3/5/08</u>: continue with IFES to shoulder, PROM for flexion, abduction and rotations, and therapeutic strengthening
- <u>3/10/08</u>: continue with PROM for shoulder, IFES to shoulder and therapeutic strengthening
- <u>3/12/08</u>: continue with IFES to shoulder, PROM for flexion, abduction and rotation along with therapeutic exercises for strengthening
- <u>3/14/08</u>: continue with IFES to shoulder, PROM and therapeutic exercises for strengthening
- <u>3/19/08</u>: saw physician - therapy not helping. Discharged claimant from PT

**Questionnaire, Marilyn Horacek, D.O., 7/7/08 (Tr. 619-23)**

- psychological conditions: depression, anxiety, personality disorder
- incapable of performing low stress jobs
- can walk 1 block without resting
- can sit continuously for 30 minutes
- can stand continuously for 15 minutes
- can sit about 2 hours in 8-hour workday
- can stand/walk less than 2 hours in 8-hour workday
- can occasionally carry less than 10 pounds; can never carry more than 10 pounds
- patient has significant limitations in doing repetitive reaching, handling, fingering

D.     Testimonial Evidence

Testimony was taken at the hearing held on March 21, 2007.  The following portions of

the testimony are relevant to the disposition of the case:

Q      Okay, and your date of birth, according to the record, is January 29, 1958.  Is that correct?
A      Um-hum.
Q      How old are you today?
A      How old am I?  Fifty.
                        *               *               *
Q      Okay.  How far did you go in school?
A      Eighth grade.
Q      Did you complete the eighth grade?
A      No.
Q      Okay, so you completed the seventh grade?
A      Yeah.
Q      And went to the eighth?
A      Um-hum.
Q      Have you, at any point, obtained a GED subsequent to your schooling?
A      Yeah.
Q      And when did you do that?
A      In 19 - - I think - - I believe 91.
Q      Have you had any kind of vocational training, such as refrigeration, drafting, welding, anything like that, since getting your GED?
A      Since getting my GED?
Q      Or at any point.
A      Well, I went to nursing for a Certified Nursing Assistant - -
Q      Okay.
A      At Drat (Phonetic) School, which I didn't - - I wasn't able to complete because of my health reasons.
Q      Okay, when did you do that?
A      That was back in, I believe in '86, I believe.

28

Q       Okay, so you never got a certificate.

A       Well, not from Drat School; then I went to Park High not long after that and got a - - my nursing certificate.

Q       Okay, so you - - do you still have a CNA then?

A       No.

Q       The work history we have to cover is 15 years back before you said you became disabled, so we need to go back to 1991.  The most recent job that you had, what would - - would that - - what would that be?

A       Most recent one?

Q       Yes.

A       I was at Convenient Food Mart.

Q       Okay, and that's a - - like a quick-shop type of place?

A       It's a convenience store.

Q       Okay, and what did you do there?

A       I was - - I did everything.  I was cashier, I was deli and I was stocking.

Q       Okay.  Did you do everything independently, or did - - were there some days you'd do one job and some days you'd do another job?  You understand my question?

A       It varied.  I might be on register, I might not do - - if I'm on the register I'm not going to do the deli and stock.

Q       Okay.

A       If I'm in the deli, I'm going to do the deli and I'm going to stock.

Q       Okay.  And same thing with stocking?

A       Um-hum.

Q       Okay.  But the cashier work, what might be the heaviest thing you lifted in the job?

A       People's groceries and stuff, and like milk, potatoes.  I mean, I had to keep - - chuck - - lift stuff up.

Q       Would you ever have to lift over 20 pounds as a cashier?

*               *               *

A       All at one time, or just - -

Q       Well yeah, at one time.

A       If I'm bagging all their stuff and the people come in with all - - like gallons of milk for WIC, and like juices and all that, yeah.

Q       Okay.  Over 50 pounds?

A       Not - - no, I don't think so.

Q       How about the deli work?  Would there be lifting over 20 pounds in that job?

A       Just lifting like big things of meat to cut, stuff like that, or if I had to do chicken, I had to lift up a whole basketful of chicken.  And that was - - it all depends, I don't know how many pounds that is.  It's, it's a lot.  If I'm - -

Q       You think it was over 20?

A       If people ordered chicken, like if they were having some kind of event or something, then we'd have to keep frying and frying it over and over and over, yes, I'm going to be lifting up a whole lot of chicken.

Q       Okay.

29

A       It all depends, because then I would have to have somebody to help me anyways.

Q       So the, the, the - - so would you lift over 50 pounds in that job?

A       I don't think so.

Q       Okay, but over 20?

A       Maybe.

Q       Okay, what about the stocking job?

A       I had to do - - just stock like beer, milk, sodas, stuff like that.  Cases of beer, stuff like that.

Q       Would the cases be about the heaviest thing you'd have to lift in the stocking job?

A       Cases.  I mean, it wasn't just only one case of beer; I mean there's cases.

Q       Would you have to lift more than one case at a time?

A       No.

Q       Okay, so a case would be the heaviest thing?

A       Maybe a - - well, maybe a couple cases and stock them.

Q       Okay.

A       I'd just have to keep doing it one after the other one, after the other, and just stock, stock, stock.

Q       Okay.  How long did you work the Convenient job?

A       I was at Convenient since about, I believe the end of, I believe the end of - - let me think.  Either the end of 2003 or 2004; I can't remember, one of them.

Q       Okay, so you worked there for at least a couple years?

A       At least a couple years.

Q       And what'd  you do before that?

A       I was in prison.

                  *             *             *

Q       Okay, and what were you in prison for?

A       For drugs.  Just - -

Q       Okay, what - - possession or selling?

A       Selling.

Q       Did you have to do any kind of rehab program while you were in prison?

A       Yeah, I did a nine-month intensive drug program.

                  *             *             *

Q       Okay, and how long were you in prison for?

A       From '97 to 2003.

Q       So about seven years?

A       About six and a half to seven, yeah - - because I went to a halfway house for six months.

Q       Okay.  Did you work anywhere prior to 1997, before you went to prison?

A       I was doing - -

Q       We have to go back to '91, so about five or six years before you went to prison.

Q       Okay, well what I got right before then, I was doing like nursing, in-home nursing.

Q       CNA?

A       Yeah.

Q      Okay.  And who'd you work for?

A      It was a agency in Ellenboro; I don't remember the name - -

Q      Doctor's Homemaker's Services?

A      In - - it's like a - - I think it was MVA or something nursing, and  - - I think it was called MVA or something like that.  It was two - - a couple of them.

Q      Okay.  Was this full - - full-time or part-time?

A      Whenever they needed me.

Q      Okay, so as needed?

A      Yeah.

Q      How many hours were you averaging, probably, a week?

A      A week?  Not too many, because like if I had to go - - they send me somewhere, I might do about maybe four, maybe six hours.

Q      Okay.

A      For each person they sent me to.  It wasn't every - - it wasn't a everyday thing.

                         *              *              *

Q      Did you do anything else besides being a nurse's aide between '91 and '97?

A      No, I don't think so, I think that was - - that might have been - -

Q      And the, the certified nursing job, was that lifting patients and doing that kind of stuff as we typically understand it to be?

A      I was - - well we had a Hoyle - - what they call a Hoyle lift, but the patient needed to be put in the Hoyle lift, you had to put them in the Hoyle lift and lift them up.

Q      What might be the heaviest - -

A      And mostly the ones that was in-home care was mostly the ones that could do things mostly on their own.

Q      What might be the heaviest thing you lifted in your certified nursing jobs?

A      Well a patient, on a Hoyle lift.

Q      Would it be over 50 - - would you have to lift independently over 20 pounds?

A      Yeah.

Q      Over, over 50 - -

A      They weigh more than that.  The person that's in a Hoyle lift - - you have to lift the person in the Hoyle lift.

Q      Okay, but, but that would be assisting you, right, with your lifting?

A      Yeah.

Q      Okay, so how much would you actually have to lift yourself?

A      Well, it wasn't me - - it was not just only me, but another patient had to - - her - - had - - another person had to help me too.

Q      Okay.

A      They just didn't use one person for a Hoyle lift.

Q      Were all the certified nursing assistant jobs performed primarily the same?

A      Yeah.

Q      That you did?  Okay.  Now you - - on your application for benefits you said you became disabled June 1st of 2006.  Can you tell me and the judge - -

A      Yeah - -

Q      - - what's been your problems since then, as far as why - -

A       I came disabled - - yeah, about that time, because the car accident happened in 2006, in February.

Q       You were involved in a motor vehicle accident?

A       Um-hum.

Q       Okay.

A       That's when all of this happened.

Q       Okay.

A       Dar as my shoulder and stuff.

Q       Were you a passenger, driver?

A       The first - - it was two accidents.

Q       Okay.

A       The first accident I was with a friend.

Q       And you were a passenger?

A       I was a passenger.

Q       And the second - -

A       Parked.

Q       - - one?

A       And the second one I was at the stop sign, and the girl's brakes went out and hit me.

Q       Okay, so you were the driver in that one.

A       I was a driver in that one.

Q       And at any - - in either of those, were you at fault, or was the other driver at fault?

A       No, we weren't at fault at all.

                       *                *                *

Q       Now what physical or mental problems has - - have you suffered, either from these accidents or from any other reason, which have affected your ability to work? And start with the most significant problem that you have and work your way back, if you could.

A       My rotator cuff.

Q       And that would be your left shoulder?

A       My left shoulder.

Q       Okay, what's the problem with it?

A       It was - - well the first - - I had a surgery done for my - - I had a tear in it.

Q       Okay.

A       And I can't lift my arm up, and I been going to therapy. And my doctor stopped the therapy because he wants - - he has to do another surgery, because I got torn tendons.

Q       Okay, and that's in your left shoulder?

A       Yeah. I was supposed to had the surgery done, matter of fact, this month, but I got sick, so they couldn't do the surgery.

Q       Okay. So that's going to be at some point in the future?

A       Yeah. Soon as I get well, because I had a real bad sinus infection, and I couldn't breathe. I was stuffed up. So they couldn't put me under.

Q       Okay. And - -

A       And he don't want me doing nothing with this arm. He took me off therapy because it wasn't doing, it wasn't doing my arm no good. I could - - I mean, it wasn't getting

better.  I still can't lift my arm up.

Q      And you're referring to your left arm?

A      Yeah, my left arm.

Q      Are you right or left-handed?

A      Right-handed.

Q      What other problems do you have, if any?

A      Depression.

Q      Okay.  Do you see somebody for that?

A      Yeah.

Q      Okay, do you see a, a counselor?

A      A psychiatrist and a therapist.

Q      Okay.  And how do you think that affects your ability to work?

A      Well, I'm so depressed, and my coworkers, I don't get along with people, period.  I don't like being around people, and when I was working it was always argument.  I, I be thinking people's talking about me and stuff like that.

Q      This is before the accident?

A      This - - yeah, this is before I - - this has been going on for a long time, and I hear voices and I be thinking people's talking about me, so I don't get along with people at all.  So I don't be around people, I just try to stay to myself because I get, I get real angry and I - - argue with people, argue with my sisters, I argue with everybody.  Because I just don't like being around people, and people don't understand.  They think that I'm just, you know, trying to be funny or something.  And I try to explain to them, I'm just a - - I don't like being around people, period.

Q      Okay.

A      I just like being to myself.

                    *              *              *

Q      - - anything else physical or mental that's wrong with you?  Here's a tissue.

A      Just - - and I haven't been able to see my mother, because I can't drive to get down there.

Q      How come you can't drive?

A      Because I can't sit, I can't sit for a long period of time.  My friend, she took me down a few times, and I just couldn't take that ride.

Q      Where does your mother live?

A      She's in a nursing home (INAUDIBLE) West Virginia.

Q      How far away is that from here?

A      That's about a two-half - - about a two-and-a-half hours, three hour drive.

Q      So you have your left shoulder problems and depression.  Anything else?

A      Just, just stress, depression, and my shoulder, my neck, and my back.

Q      What's wrong with your neck and your back?

A      I have a lot of inflammation and (INAUDIBLE) from the wreck, and just - - it tightens up and that tear just make it hurt worse.  And I got bulging discs in my back.  My back

always hurts.

Q     Have you had any physical therapy for your neck or your back?

A     Yeah.

Q     Did it help?

A     I was going to a chiropractor a lot.

Q     Have you ever had any kind of surgery on your neck or your back?

A     No, I just had the surgery on my - - it was - - what is - - the pain is coming from my shoulder.  The inflammation and everything in my - - I was getting shots from Dr. Shilafo (Phonetic), steroid shots and some other kind of shots but probably - - he was giving them to me so much he couldn't keep giving them to me, because he said it's nothing more he could do.

Q     Anything else?  I see in your medications you're taking some - -

A     Oh, yeah.

Q     You're taking insulin?

A     Yeah, I'm a diabetic.

Q     Okay, and do you think that has any impact on your ability to work?

A     Yeah, I have to take my shots.  I take shots.  My sugar stays high.

Q     Has the, has the medication been assisting with controlling your sugar levels?

A     No.  they're thinking about putting me on some more, because my sugar, my sugar's too high.

Q     How often - -

A     It's running like three - - in the 300's, 400's, 200's.

Q     That's where it's been averaging?

A     Um-hum.

Q     How often do you check it?

A     Probably at least four times a day.

Q     And how many times do you have to give yourself shots?

A     All depends on how high it is.  I have to take - - I take Lantus at night at bedtime, that's 76 units, and I take my Novolin R with my meals.  That's three times a day.  And then if it's up still high, I have to take another shot to get it down.  My Actos.

Q     Have you talked with your doctor about the fact that you can't - - your sugar has been high and this stuff's not working?

A     They're trying to, they're trying to control it, but it just - -

Q     Are they adjusting your medications or anything?

A     Then there's them two - - pain too, makes my sugar go up.

Q     Pain from your shoulder?

A     Yeah.

Q     Dr. Horshack had indicated you had carpal tunnel?

A     Yeah.  Dr. - - I think his name was Dr. Cutler, he did a exam on me.

Q     EMG?

A     Because my fingers get stuck.  When I was working they were getting stuck, where I had to tell my coworker to pull my fingers because they were stuck and they were hurting, and she's like, what's wrong?  I said I don't know, I said my fingers are stuck.  Because they'd get like this and get stuck if grip something or whatever, they get stuck.  I used to crochet, so I, I don't even - - I can't do nothing no more.

Q   Are the - - is the right and the left the same, or are they different?  Do you understand my question?

A   This one is - - I guess - -

Q   Your - - okay, you can't say this one.  You got to tell me which one.

A   The left hand is - -

Q   Okay.

A   - - is worse than the right hand.

Q   You haven't had any kind of releases or anything, any kind of surgeries on your carpal - - the carpal tunnel release?

A    No, not yet.  No, they trying to get this done first, my shoulder and stuff.

Q   You're, you're referring to your left shoulder again?

A   Um-hum.

Q   Okay.  Do you have any other physical or mental problems that you believe affect your ability to work, other than that which we've discussed?

A   It's like I said, I, I, I'm depressed all the time and I'm stressed, and I, I argue with people, and I just - - I don't know, I just - - I have a lot of anger.  I mean, I used to go to anger management classes.  I just - - I was a rape victim when I was 12 years old, and I went to therapy for that too, and - - and that's one reason I don't like to be around people either.  I don't know, I just, I just don't like to be around people.  I don't know, I just, I just don't like to be around people.

Q   Do any of the problems that you've described today affect your ability to sit?

A   Yes.

Q   Which - - what problems and how do they affect you - -

A   Like now this - - it hurts in my back and my shoulder.

Q   And how long can you sit for a stretch?

A   I can - -

Q   Say, say in the chair that you're sitting in right now, maybe it would be - -

A   It's - - yeah, well it's starting to bother me now.

Q   Okay, so how long do you think you could do it for?

A   Maybe about 15 minutes, 20 minutes.

Q   How about standing?

A   Standing - -

Q   Any, any problems affect - - anything - -

A   Maybe about 25-30 minutes.

Q   What problems do you have?

A   My legs.  They're - - matter of fact, I talked to a doctor to see if I have blockage in my legs or anywhere, because my sister was having the same problem, her legs hurt.  A lot of heart problems go through our family as far as blockage.  My mother had blockage, my sister had blockage, and I was telling him I was having the same thing far as my legs.  They always hurt all the time.  And he said he wanted to do a test to see if I had blockage in my legs, too.  Dr. Clay.

Q   He's a heart doctor?

A   Yeah, he's a heart doctor.

Q   Okay, you have - -

A      Because he said that's important, because my sister had a, a double bypass, and then she just had surgery on a Monday and Wednesday because - - she had two surgeries on a Monday and Wednesday because - - she had two surgeries in one week because she didn't even know she had blockage in her neck, and they had to - - she almost died.  She had 80 percent, and 90 percent in the other side, in both sides.  And I was telling him, I said well I'm having the same problems, like with my legs and stuff, they always hurting all the time.  He said well, I'll need - - you need to come here and get test done too, because all that runs in your family, and it's important.

Q      Have you had this test done now?

A      No.  I'm trying to get all this done first.

Q      Again, you're referring to the left shoulder.

A      My left shoulder.

Q      Okay.  Do any of the things that you described, the problems that you described, affect your ability to walk?

A      Yes.  I mean, sometimes I can't get up out a chair.  I might try to stand up out a chair, and then I fall right back in the chair.  My leg is always hurting, on this - - mostly on the right-hand side.  My leg, and it goes up to, like by my buttocks.

Q      Okay, and how far do you think you could walk on level ground?

A      Well, sometimes I'll go ahead and try to walk down to the store.

Q      How far would that be?

A      That's just like maybe - - I'd say about a block and a half, something like that.  It's just right down from my house.

Q      Okay.

A      And then I'll try to come back, it's like I got to stop because my legs are hurting.

Q      The block and a half to the store, can you do that okay?

A      When I walk down?

Q      Yes.

A      Yeah, but when I get ready to come back, that's when my legs get to hurting and I have to stop.

Q      How much weight do you think you can lift and carry?

A      Not much.  Because even when I try to lift up a gallon of milk it hurts my left arm.

Q      Is there anything comfortable at all to lift?

A      It's like - - matter of fact, my doctor told me he didn't want me lifting this arm, period.  He don't want me doing nothing with this left arm.

Q      What about the right arm?

A      He don't even want me working right now, he said.

Q      What about the right arm?

A      Right arm, I can lift a gallon of milk with my right arm.

Q      Why don't you describe for me what your days are like right now, from when you get up in the morning to when you go to bed at night?

A      Well, sometimes I might, I might stay in the bed all day.  I don't even - - I mean, all this medication and depression and stress I'm under, I don't even want to get out the bed, period.  There's days I just don't even want to get up.  I don't even clean my house up.  You

know.

Q      Who - - well what do you do about food?

A      Well, sometimes I get somebody to go with me because I can't lift up my food - - I can't lift my groceries to put them in my car and, and take them out the car if they're heavy, so I'll get my neighbor - - matter of fact, I went to the grocery store and I got my one neighbor to go with me, John.  He went with me and carried my groceries in the house and stuff.

Q      What about cooking it, once you get it home?

A      Well I don't, I don't really cook.  I might put something in the microwave or something in the oven.  I like - - I might eat pizza or something like that; I don't really cook.  I mean it's - - you know, and it's only me and then I don't be feeling like cooking.  I just whatever, make a couple sandwiches or whatever, something like that.

Q      You live in an apartment; do you have a yard to take care of?

A      Well, yeah.  There's - - matter of fact, my maintenance man cuts the grass, but I used to have a garden.  I used to garden.  But that was the first garden I ever had in that yard, you know, and I like growing stuff, flowers and stuff.  I don't even - - it looks a mess.  I don't even, I don't even fool with it.  I can't even do it no more.

Q      Well, do you have anything that you still can do, that you do, like hobbies or activities?

A      I don't, I don't even have an interest in doing nothing.  I used to do things, I just don't have no interest in doing nothing no more.

Q      Do you ever visit friends or relatives, or have them come visit you?

A      No, don't nobody come to visit me.  My sister will come down and check on me sometimes, or my, my friend Lisa, but me and her argue all the time because I don't never want to go nowhere or do things.  She's like, what is wrong with you?  You act like you don't want to be bothered.  I said, it's not that, I said, you all don't understand.  I just don't like being around people sometimes, you know.  When I do be around them we argue and stuff, because I just - - you know, I just want to stay to myself.

Q      Is there anything that you used to do that you don't - - - that you no longer do?

A      I, I mean, I used to, you know - - I used to go to Kennywood Park, I used to do my garden.  There was a lot of things I used to do, you know.  I used to go out with my sister. We don't, we don't do nothing no more.  She was like, what's wrong with you?  I just, I just, I just don't want to be bothered.

Q      We provided a list to the judge of 14 of your medications that you're currently taking.  Those are the present medications that you're on?

A      Yeah.

Q      Do you know if you experience any side effects from those medications?  Do you understand what my question is?

A      No, there's no side effects.

Q      With regard to the Hydrocodone, is that for pain?

A      My pain.

Q      Where is the pain in your body?

A      My shoulder and my - -

Q      And you're referring, again, to your left shoulder?

A      Yeah, and my back, right in there, and my back, my shoulders.

37

Q      Can you describe for me the, the pain that you have in your shoulder?

A      It was to the point where it was hurting so bad I, I, I was ready to commit suicide. I was hurting so bad, and I kept telling Dr. Horshack, I'm hurting real bad, because it just kept throbbing and hurting in my back.

Q      Is it still - - does - -

A      And he said, my doctor said - - Romboski (Phonetic) said that was from the tear in my, my, my back of my rotator cuff. And that's the one he, he did the surgery last August. And that was from the tear in my shoulder making me hurt so bad, now, and I got torn tendons in my shoulders. Same thing.

Q      Is the pain still the same?

A      Yeah, it's like a throbbing.

Q      How would you rate the pain level in your, in your shoulder, on a scale from one to ten, one being little to no pain; ten being completely unbearable pain?

A      It just varies. When it hurts real bad, it's like maybe a nine or a ten, sometimes an eight.

Q      Okay, does it ever - -

A      But some days it might be a five.

Q      Is five the least the least it ever is?

A      About, about five.

Q      Are you ever pain-free?

A      huh?

A      No.

*        *        *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q      Then would you describe her work in the past 15 years in terms of skill and exertional level?

A      Her work as a cashier at the food market is basically a light and unskilled, and including the deli work, which is light and unskilled. It could infrequently range to the - - into the medium with the stocking. The - - I'm not sure that the CNA work was ever relevant.

Q      Okay.

A      But if it is, it's medium and semi-skilled, Your Honor.

Q      All right. And then let me ask you to assume a hypothetical individual of the claimant's age, educational background, and work history, who would be able to perform a range of light work; would require a sit/stand option; could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds; should do no overhead or side lifting or reaching with the non-dominant left upper extremity; should not be exposed to temperature extremes, wet, or humid condition, or hazards; should work in a low-stress environment with no production-line type of pace or independent decision-making responsibilities; would be limited to unskilled work, involving only routine and repetitive instructions and tasks; should have no interaction with the general public, and no more than occasional interaction at the most with coworkers and supervisors. Would there be any work in the regional or national economy that such a person could perform?

A      Yes, Your Honor. The - - at the light level I believe that hypothetical individual

could function as a laundry folder, light, 50,000 nationally; 650 regionally.  And the region is West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania.  Or as an office assistant, light, 150,000 nationally; 1,850 regionally.

*   *   *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q With respect to the jobs that you've identified, if I were to tell you that the same hypothetical person would be off-task 25 percent of the time or more, would that impact the hypothetical person's ability to perform these jobs?

A That would not allow for a competitive work routine.

Q Original hypothetical question, but I would give you a different restriction that that  person would be absent for work more than four times per month as a result of an impairment or treatment, and this would be unscheduled absences.  Would that impact that person's ability to perform those jobs?

A That would not allow them to continue in competitive work.

Q Okay.  And if a person needed to lie down even for one hour outside of unscheduled breaks, either just to lie down and/or sleep, would that impact the - - a person's ability to perform most, or not all, unskilled work?

A That would take them off-task more than 10 percent of the time, and they wouldn't be able to, to continue the job.

Q Okay.  And, and can you just tell me, with respect to the laundry folder position and the office assistant position, how much percentage-wise of the, of the day does a person have to use their hands for either grasping, turning, or twisting objects, or fine manipulation?  Roughly?

A The, the - - it would be more with the laundry folder.

Q Okay.

A I would say - - it's, it's limited what I would call fine manipulation.  But gross grasping and use of the hands would be almost continuous throughout the day.

Q Okay.  So almost 100 percent on that?

A I would say at least 90 percent.

Q Okay.  What about the office assistant job?

A It, it wouldn't be as, as much, but it'd be - - it'd still be very significant, in the 80-85 percent range, I'd say.  Those are - - that's best guesses there.

*   *   *

E. <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- does not get along with people (Tr. 50, 135)
- is unable to drive (Tr. 51)

39

- is unable to sit in a car for long distances (Tr. 51)
- is able to sit for 15-20 minutes (Tr. 56)
- is able to stand for 25-30 minutes (Tr. 56)
- is able to walk to the store, which is 1 ½ blocks from her house (Tr. 57)
- has trouble lifting a gallon of milk with her left arm (Tr. 58)
- sometimes needs assistance grocery shopping (Tr. 59)
- does not cook but can use the microwave and prepare sandwiches (Tr. 59)
- can no longer take care of her garden (Tr. 59)
- no longer has any hobbies (Tr. 60)
- sometimes has visitors (Tr. 60, 134)
- goes to therapy five times each week (Tr. 130)
- cares for pet cat (Tr. 131)
- difficulty sleeping (Tr. 131)
- difficulty lifting left arm in order to dress, bathe, and do her hair (Tr. 131)
- sets phone alarm to remind her to attend doctor appointments (Tr. 132)
- does not prepare meals; eats out or at work (Tr. 132)
- does laundry, irons, and cleans (Tr. 132)
- goes outside everyday to go to therapy or work or to go shopping (Tr. 133)
- drives a car (Tr. 133)
- shops (Tr. 133)
- able to pay bills, count change, handle a savings account, use a checkbook/ money order (Tr. 133)
- watches television (Tr. 134)
- has some trouble following written instructions (Tr. 135)
- does not follow spoken instructions well (Tr. 135)
- does not handle stress well (Tr. 136)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant SSI is not supported by substantial evidence because the ALJ improperly evaluated Claimant's credibility and improperly rejected the opinion of Claimant's treating source regarding Claimant's residual functional capacity.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the ALJ complied with the two-prong test and properly evaluated Claimant's credibility. Additionally, Commissioner argues that the ALJ's decision is supported by substantial evidence

because the ALJ carefully considered all of the medical opinions of record, weighed the opinions against the other evidence, and articulated legally sufficient reasons for affording limited weight to the treating physician's opinion.

B.    Discussion

1.    Whether Substantial Evidence Supports a Finding that Claimant was not Entirely
       Credible.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in his credibility assessment. Specifically, Claimant alleges that the ALJ was biased and overlooked the consistency of Claimant's testimony with the objective medical evidence and Claimant's statements to treating physicians. In arguing that the ALJ was biased in his credibility determination, Claimant argues that the comments purporting to support the lack of credibility finding, in actuality, provide no support for the ALJ's finding.

Commissioner contends that the ALJ appropriately analyzed Claimant's subjective complaints under the Craig v. Chater framework. Specifically, Commissioner contends that the medical evidence of record did not support Claimant's claims of debilitating limitations, Claimant was inconsistent in reporting of daily activities, and the ALJ noted additional factors all of which discredited Claimant: Claimant continued to work but did not do any heavy lifting; Claimant's injuries appeared to be far greater than relatively minor vehicle accidents would suggest; Claimant sought mental health treatment only after Claimant's disability claim was initially denied; Claimant had a poor work history; and Claimant's complaints of left shoulder pain related to her non-dominant, left-upper extremity.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence"

is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

SSR 96-7p sets forth certain factors for the adjudicator to consider when determining credibility. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about

claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

To qualify as judicial bias, the actions of judges must be shown to "display deep-seated favoritism or antagonism that would make fair judgement impossible." Liteky v. U.S., 510 U.S. 540, 555 (1994). While what constitutes judicial bias is not defined, judicial remarks during course of trial critical or disapproving of, or even hostile to, counsel, the parties, or their cases do not support a bias challenge; additionally, expressions of impatience, dissatisfaction, annoyance, and even anger that are within confounds of what people sometimes display do not establish bias. Id. at 555-56.

In coming to his conclusion that Claimant was not entirely credible, the ALJ complied with the two-part test in Craig. First, the ALJ found, in accordance with step one, that "claimant's medically determinable impairments could reasonably be expected to produce some

of the alleged symptoms." (Tr. 22). Second, in accordance with step two, the ALJ dedicated nearly seven pages of analysis to explaining his reasoning for discrediting Claimant's testimony. (Tr. 22-29).

In accordance with the factors set forth in <u>SSR 96-7p</u>, the ALJ examined the objective medical evidence, Claimant's daily activities, Claimant's work history, and Claimant's statements concerning the limiting effects of his symptoms. First, the ALJ examines Claimant's work history. The ALJ notes that despite filing the application in June 2006, Claimant admitted in a disability report dated June 27, 2006, that she was "working as a cashier from November 2003 to the present . . . . The claimant self-reported that she typically worked nine hours per day about four days per week." (Tr. 22). This, the ALJ explained, was so close to a 40-hour workweek that it appeared Claimant was capable of working forty hours. (Tr. 22). Additionally, "the claimant has very little work history of significance, which suggests poor motivation to work." (Tr. 24). Second, the ALJ notes Claimant's self-reported daily activities of preparing her own simple meals, doing laundry and other household chores "if she does not hurt too badly," running a vacuum cleaner, driving, and shopping. (Tr. 23). Third, the ALJ noted that Claimant is right-handed, which "is deemed to be significant given that her pain complaints often pertain to the left upper extremity." (Tr. 23).

Next, the ALJ engages in an extensive review of the inconsistencies among Claimant's subjective complaints and the objective medical evidence of record. The ALJ starts by examining Claimant's September 15, 2005 visit to Dr. Monderewicz. (Tr. 23). Despite Claimant's allegation of chronic low back pain, the doctor's assessment was that Claimant "had chronic neck pain with objective findings for 'some' tenderness in the cervical area with a slight

44

decrease in range of motion (ROM)." (Tr. 23). The results also showed that Claimant's forward flexion was 90 degrees, which is normal, and a lumbar spine x-ray and pulmonary function studies were also normal. (Tr. 23). Next, the ALJ notes that despite complaining of back and neck pain resulting from her 2006 car accident, a "thoracic x-ray was normal and a cervical spine x-ray showed normal height and alignment of the vertebrae (Exhibit 6F)." (Tr. 24). The ALJ then examines Claimant's dedication to her physical therapy regimen. The ALJ notes that Claimant's "physical therapy at Ohio Valley Medical Center lasted only briefly. . . . She did not bring her clothes for her pool therapy on June 27, 2006 and then cancelled her next appointment (Exhibit 9F)." (Tr. 24). This weighed heavily in the ALJ's assessment evidenced by his statement that he "would expect more effort toward treatment compliance from a person sincerely wanting to resolve substantial and persistent pain." (Tr. 24). The ALJ also found "it interesting that the claimant reported six weeks of physical therapy due to the February 2006 accident, but there is no attendance (Exhibit 13F, Page 2 and Exhibit 9F)." (Tr. 25). Additionally, the ALJ notes that on March 10, 2007, Claimant presented to the emergency room at OVMC complaining of another car accident; however, "the only diagnoses at this point were multiple contusions, cervical strain and left shoulder contusion (Exhibit 20F). . . [these diagnoses] do not appear to present a totally disabling condition." (Tr. 26). The Claimant also saw Dr. Zaleski for left shoulder treatment, which "resulted in marked improvement within 11 days with only some limitation at the end points of rotation (Exhibit 21F)." (Tr. 26). After reinjuring the shoulder, "the doctor noted that the claimant's left shoulder motion was fairly well maintained. There were some limitations and some tenderness in the subacromial area. The shoulder x-rays showed that the glenohumeral joint was still well-preserved and there was no

45

significant tenderness over the acromioclavicular joint." (Tr. 26). Claimant's working diagnosis was "a left subacromial bursitis in the left shoulder treated with injection with expected improvement (Exhibit 21F)." (Tr. 26). Claimant complained again about her shoulder; however, a MRI taken on June 6, 2007, "showed only a supraspinatus tear of the tendon (Exhibit 23F)." (Tr. 26). Again, the ALJ notes that "this is not the claimant's dominant upper extremity." (Tr. 26). The ALJ also places particular emphasis on a May 21, 2007 report indicating Claimant "was examined by Dr. Haus for left shoulder problems and it was noted that she had undergone surgery for this problem and that UPMC was reportedly suggesting a total shoulder replacement but the claimant could not pursue that due to transportation problems." (Tr. 27). The ALJ indicated that "this is a fairly weak excuse for not having what would appear to be a rather serious surgery assuming it were necessary." (Tr. 27-28). The ALJ also emphasizes that Claimant "had apparently not followed up on the MRI as Dr. Chalifoux had recommended either (Exhibit 29F). As Dr. Chalifoux stated, if this were related to the car accident, he would expect follow up with a letter of protection to cover the MRI." (Tr. 28). This, too, weighed heavily on the ALJ's credibility determination because following Claimant's non-compliance with Dr. Chalifoux's suggestions, Dr. Chalifoux discharged Claimant from his care, and within two months, Claimant "was at mental health complaining of shoulder problems but failed to follow through with the orthopedic care as directed." (Tr. 28). As to the last of the physical impairments, the ALJ notes that although Claimant asserted visual impairments to the DDS officials, "there is no acceptable evidence to support any ongoing limitation." (Tr. 26).

Finally, the ALJ examines Claimant's past and potential abuse of drugs in relation to Claimant's psychological treatment in his credibility analysis. Claimant testified to being in

prison for years for selling drugs. (Tr. 27). The ALJ notes that Claimant obtained benzodiazepines through Northwood with complaints of sleep problems. (Tr. 27). This was bothersome to the ALJ for several reasons. First, the ALJ notes that Claimant "began alleging mental health issues and resumed mental health treatment in July 2007, which appears to have been out of frustration and situational facts, and at least in part to obtain support of the social security claim and/or MVA lawsuits. Indeed, she was self-referred with a report of stress over the motor vehicle accident and unresolved shoulder issues (Exhibit 26F) and there was indication of her losing her job and not being approved for social security disability." (Tr. 26). This return came after a "lengthy hiatus" (from January 2005 to July 2007) and "just prior to her Social Security hearing (Exhibit 26F)." (Tr. 26-27). Second, on August 13, 2007, Claimant reported that "her doctors were not 'treating her well.'" (Tr. 26). Claimant also reported that she "was aggravated with her doctors and treatment modalities as she was not getting medications that she wanted for pain control (Exhibit 26F)." Interestingly, the ALJ notes, "the claimant wanted Ultram medication even though Ultram is not recommended where there is any history of addiction to alcohol or drugs (Exhibit 26F). It is of further note that Ultram is prescribed for mild to moderate pain." (Tr. 27). Third, despite a diagnosis of major depressive disorder with psychosis, the ALJ notes that "the medical records generally do not report 'psychosis' and [Dr. Corder] acknowledged the absence of objective signs or subjective symptoms of the same." (Tr. 27). Thus, the ALJ noted, "the psychosis appears to be a subjective initial assessment to support treatment for the claimant and appears slanted toward the claimant. For instance, the claimant told Dr. Corder she was not using cocaine but had 'been using alcohol' and was not interested in the crisis unit, because she had 'a wedding to go to' and was 'going to drink' (Exhibit 26F) and

he merely considered alcohol abuse."  (Tr. 27)

Not only did the ALJ comply with <u>Craig v. Chater</u>, but the ALJ's statements concerning Claimant's motor vehicle accidents and work history do not constitute bias.  Claimant argues that the ALJ's statements regarding Claimant's legal action following the motor vehicle accident and Claimant's work history constitute bias.  Specifically, with regard to Claimant's work history, Claimant argues that the ALJ's reference to Claimant "working as a cashier up until she filed her application for benefits, noting that she worked close to SGA level up until the claim was filed" should have supported Claimant's credibility rather than detract from it.[5]  Claimant then makes general reference to "further bizarre comments . . . made regarding the medical documentation and her daily activities" before stating that "what's perhaps most telling regarding the ALJ's obvious bias are the comments made by the ALJ regarding her legal actions regarding her MVAs, then goes on to state that the pending litigation related to these MVAs leads him to question the Claimant's motivation to overstate the severity of her impairments."[6]

While the ALJ's comments do indicate a skepticism regarding Claimant's filing for SSI, his comments regarding Claimant's work history and pending legal actions do not "display a deep-seated favoritism or antagonism that would make fair judgment impossible."  <u>Liteky</u>, 510 U.S. at 555.  As the Supreme Court instructs, judges may be "exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person," upon completion of the evidence; however, the "judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of

---

[5] Pl. Br. P. 11-12.

[6] Pl. Br. P. 12.

the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." Id. at 550-51. In this case, Claimant failed to argue specifically just how the ALJ's comments were anything more than his lawfully formed opinions regarding Claimant's credibility.

Therefore, this Court finds that the ALJ had more than a mere scintilla of evidence and appropriately discredited Claimant's subjective statements regarding her pain, symptoms, and limiting effects.

2. Whether the ALJ Gave Appropriate Weight to the Medical Evidence Submitted by Treating Physicians.

Claimant argues that the ALJ erred by rejecting the Claimant's treating source opinion regarding Claimant's true RFC. Specifically, claimant argues that Dr. Horacek, Claimant's family doctor, essentially restricted Claimant from performing all work beyond a reduced range of sedentary work and that the ALJ erred by not affording great weight to that opinion since he did not cite persuasive contradictory evidence. Additionally, Claimant argues that the ALJ also erred by rejecting GAF scores provided by actual treating mental health specialists and providing his own insight into according them little weight or reliability in determining Claimant's mental status or functioning.

Commissioner contends that the ALJ carefully considered all of the medical opinions, weighed the opinions against the other evidence, and articulated legally sufficient reasons for affording limited weight to Dr. Horacek's opinion. Specifically, Commissioner contends that the ALJ properly found that Dr. Horacek's opinion that Claimant could not perform even sedentary work was not supported by the medical and non-medical evidence in the record.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). To decide whether the impairment is adequately supported

by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Dr. Horacek, Claimant's treating physician, suggested that Claimant was "extremely disabled (Exhibit 31F)." (Tr. 25). The ALJ, however, rejected this opinion in finding Claimant was not disabled. In so rejecting, the ALJ examined the supportability of Dr. Horacek's opinion based on his own medical records as well as the other objective medical evidence. Claimant mistakenly believes that the ALJ provided no explanation for giving less than controlling weight stating that the ALJ merely referenced a January 3, 2007 report as contradictory evidence. However, the January 3, 2007 report was just the first in a list of contradictory evidence.

First, the ALJ notes that despite the opinion of extreme disability, Dr. Horacek's notes from the January 3, 2007 physical exam "showed little from a musculoskeletal standpoint in that she found the claimant's strength to be 5+ in all extremities with no spinal tenderness, normal curvature, and no muscle spasm." (Tr. 25). Second, the ALJ notes that Dr. Horacek stated that Claimant "suffers from neck pain, back pain, and bilateral hand pain and tiredness." (Tr. 29). However, the ALJ states that despite Dr. Horacek statement "that the clinical findings supporting her statements include MRI's, EMG's, and X-ray findings significant for bilateral carpal tunnel syndrome (CTS)," there was neither significant objective treatment nor complaints for any bilateral hand problems or CTS. (Tr. 29). Third, the ALJ states that Dr. Horacek's opinion "is inconsistent with the evidence as a whole." (Tr. 29). "This non-mental health doctor reported that the claimant was incapable of even low-stress work, yet the claimant's own treating mental

health provider indicated the claimant was doing very well. . . . Moreover, the physician adds mental diagnoses that are not supported by the mental health records and are beyond her area of expertise, which further demonstrates the subjectivity of the assessment." (Tr. 29). Fourth, the ALJ discounts Dr. Horacek's assessment that Claimant can only walk one block "because there is no significant and sustained medical evidence of record that would place such limitation on walking. Additionally, Dr. Horacek's records do not show that she ever tested how far the claimant could walk, how long she could stand, or how much she could lift." (Tr. 29). Similarly, the ALJ notes that despite Dr. Horacek's lengthy treatment as Claimant's primary care physician, "the physician fails to offer reasonably objective support for supposing that the claimant would miss more than 4 days of work per month because of her problems (Exhibit 31F, 32F, 33F) or any objective findings that show the claimant has significant and ongoing hand problems. (Tr. 29). Finally, the ALJ examines the other opinion evidence and concludes that they did not report disabling functional limitations. (Tr. 29). On the contrary, "Dr. Osborne found the claimant's complaints were out of proportion to the medical evidence and reduced the claimant's functional ability only to the medium exertional level." (Tr. 29).

In addition to affording little weight to Dr. Horacek's opinion, the ALJ accorded only limited weight to Claimant's GAF scores. Claimant argues this was error because the ALJ provided his own insight into according them little weight or reliability in determining Claimant's mental functioning.[7] In deciding to accord little weight to the GAF scores, the ALJ explained that the "scores are essentially based exclusively on the claimant's subjective complaints and other statements at that particular moment, which the evaluator rarely questions,

_____

[7] Pl. Br. P. 14.

as is evident herein.  This body of uncorroborated subjective statements is then subjectively processed through the evaluator's own individual mindset and interpretations regarding mental impairments, symptoms, severity and other factors."  (Tr. 27).  GAF scores are considered to be and are evaluated similarly to objective medical evidence.  Hoelck v. Astrue, 2008 WL 64705 (5th Cir. 2008) (explaining that the ALJ did consider the lowest GAF score because he mentioned the hospital visit when the low score was given.  This suggested that the ALJ simply concluded the GAF score was to be given little weight, which is within the ALJ's authority and discretion to determine credibility of medical records) (see also Hawks v. Astrue, 2009 WL 3245267 (S.D. W.Va. 2009) finding that the "ALJ properly noted the inconsistencies between [a treating physician's] assessed marked limitations and the GAF scores" and, therefore, did not err in considering the opinions pursuant to the rules and regulations in according weight to the opinion).

The ALJ specifically states that the GAF scores "are accorded only limited weight" after explaining that GAF scores are assessed based on Claimant's subjective complaints.  (Tr. 29).  Having previously found Claimant not credible, the ALJ properly determined to accord little weight to the GAF scores in light of their dependence on Claimant's subjective complaints.

Therefore, Claimant did not err by rejecting a treating source opinion or GAF scores.


## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision to discredit Claimant and to accord little weight

to the opinion of Claimant's treating source.

        2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.


       Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: <u>November 10, 2009</u>

                      <u>/s/ *James E. Seibert*</u>
                      JAMES E. SEIBERT
                      UNITED STATES MAGISTRATE JUDGE